**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (3d) 190730-U

Order filed April 24, 2020

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2020

| | | |
|---|---|---|
| AMBER B., | ) | Appeal from the Circuit Court |
| | ) | of the Fourteenth Judicial Circuit, |
| Petitioner-Appellant, | ) | Rock Island County, Illinois. |
| v. | ) | |
| | ) | Appeal No. 3-19-0730 |
| DANIEL B., | ) | Circuit No. 14-F-177 |
| | ) | |
| Respondent-Appellee. | ) | The Honorable |
| | ) | Clarence M. Darrow |
| | | Judge, presiding. |

_____

JUSTICE McDADE delivered the judgment of the court.
Justices O'Brien and Schmidt concurred in the judgment.

_____

**ORDER**

¶ 1    *Held*:   The trial court did not abuse its discretion in modifying the parties agreed parenting schedule, granting the child's father sole decision-making responsibilities and the majority of parenting time.

¶ 2    Petitioner Amber B. and respondent Daniel B. were never married but had a child, K.B., 2012. On July 28, 2015, they filed a joint parenting agreement establishing their respective and mutual responsibilities regarding K.B. The trial court entered an agreed order incorporating the terms of the parties' agreement. On February 26, 2019, Daniel filed an amended petition for

immediate and permanent modification of parenting time and significant decision-making responsibilities. On November 25, 2019, the trial court entered an order granting Daniel sole decision-making responsibility for K.B. Amber appeals this order. We now affirm.

¶ 3                                                    FACTS

¶ 4        In their July 2015 joint parenting agreement, Daniel and Amber agreed to several terms designed to ensure a healthy and collaborative atmosphere where they could co-parent K.B. The first term mandated that they would "discuss the major decisions affecting the health, education, religious training and the general welfare of the child prior to any major decision being made." Subsequent terms required each parent to inform the other of matters affecting their joint responsibilities if and when those matters occurred while one parent had physical custody of K.B. Said responsibilities included medical care costs, school fees and parent-teacher meetings, extracurricular activities and schedules, and other general matters. The terms required the parent with physical custody to provide K.B. with: "a) regular and nutritious meals; b) clean and appropriate clothing; c) sanitary and reasonably private living and sleeping quarters; [and] d) appropriate medical and dental treatment." The parents were required to "always conduct" themselves "so as to promote the cooperation and involvement of the other on matters concerning" their joint parenting responsibilities. The parent with residential custody was to "take the necessary action with the school authorities of the school in which the child may be enrolled to" keep the non-residential parent informed regarding K.B.'s education and related matters. Finally, Daniel and Amber agreed to "notify the other if they marry or [live] with another person."

¶ 5        The terms prohibited both parents from discussing their relationship with K.B., intruding on the other parent's privacy, questioning K.B. on the conduct or activities of the other parent, or

2

raising the issue of child support with K.B. The terms also prohibited either parent from making false allegations or abusive comments against the other parent.

¶ 6        On July 28, 2015, the trial court issued an agreed order incorporating the joint agreement's term. Therein, the trial court allocated the parties' parenting time "using a 2-2-5-5 schedule." Daniel would parent K.B. "every Monday from 3:00 p.m. or after school until Wednesday at 3:00 p.m. or after school." Amber would parent K.B. "every Wednesday from 3:00 p.m. or after school until Friday at 3:00 p.m. or after school." Daniel and Amber would alternate weekends from Friday at 3:00 p.m. or after school until Monday at 3:00 p.m. or after school." Under the joint agreement, neither parent would intrude on the other's parenting time. The court also established annual parenting time schedule for holidays, which alternated between odd-numbered and even-numbered years.

¶ 7        The court ordered Daniel to pay $260 per month to Amber in child support. It required each parent to pay half of all health insurance coverage and uncovered medical expenses. The parents would equally split any costs for sports or extracurricular activities they agreed to in advance. Each parent was responsible for the cost of daycare or childcare services during their parenting time. Daniel and Amber would alternate claiming K.B. as a dependent on their federal income taxes, with Daniel doing so in odd-numbered years starting in 2015.

¶ 8        On December 26, 2018, Daniel filed a petition for immediate modification of the parenting time and significant decision-making responsibilities. He filed an amended petition on February 26, 2019. In his amended petition, Daniel alleged that:

(1) Amber failed and refused to comply with the parenting schedule;

(2) Amber was engaging in a complete disregard of the schedule to prohibit Daniel from exercising any parenting time;

3

(3) Amber was refusing to allow Daniel contact with K.B.;

(4) K.B. had excessive excused and unexcused absences from school during Amber's parenting time;

(5) Amber, unilaterally and without Daniel's advice or consent, removed K.B. from the school he had been attending;

(6) Amber refused to provide proper nutrition to K.B., which resulted in poor health;

(7) Amber refused to communicate or cooperate with Daniel on significant decision-making responsibilities;

(8) Amber believed that she is possessed by a spiritual entity which guides her decisions regarding raising K.B. Daniel alleges that this belief resulted in erratic and detrimental parenting decisions;

(9) Daniel believes that Amber had been engaged to marry five times since the Order of July 28, 2015, and has cohabitated with these third parties;

(10) Daniel believes that Amber was unemployed and unable to support herself without relying on the assistance of third parties; and

(11) Daniel believes that Amber changed her residence multiple times.

¶ 9 Daniel argued that, because these factors involved Amber's failure to communicate with him regarding significant decisions and because she made significant decisions such as removal from school without consulting or gaining his approval, a substantial change in circumstances occurred such that K.B.'s best interest would be served by awarding Daniel sole significant decision making responsibilities. He requested immediate placement with Daniel subject to parenting time allocated to Amber. He also requested that the trial court terminate his child support obligation.

4

¶ 10     With his amended petition, Daniel submitted a proposed parenting plan under which Amber would be allocated parenting "every other weekend from Friday after school until Sunday evening, and every Wednesday from after school until 8:00 p.m." He explained that the trial court should not grant Amber overnight parenting time on a school night because of "her inability to ensure that the child attends school or arrives to school on time." Finally, Daniel proposed that all decision-making responsibilities regarding K.B.'s education, healthcare, religion, and extracurricular activities be allocated to him.

¶ 11     On April 8, 2019, Amber filed a proposed parenting plan. She requested the trial court grant her all major decision-making responsibilities regarding raising K.B. The trial court held a hearing on September 12, 2019. The evidence was as follows.

¶ 12     Daniel is a self-employed tattoo artist. He has one child, K.B., who at the time of his testimony was in the second grade at Eugene Field School in Rock Island. Daniel lives in Davenport with his wife Isabelle Guitard whom he married on June 30, 2018. K.B.'s mother is Amber who is a cancer survivor. She did not know if she was fully cancer-free, but stated that her health had not affected her ability to care for K.B. At the time of the trial, Amber had a partner with whom she was planning on spending the rest of her life. She was not living with him; instead, she lived with her parents for three years in Rock Island and shared a room and bathroom with K.B. Amber has never met nor talked to Isabelle.

¶ 13     In the Fall of 2017, Amber told the school administration that K.B. was being bullied. She also told Daniel that K.B. was cornered in the bathroom by bullies and he was so fearful that he urinated through his pants. Daniel and Amber met the principal Dennis Weiss who revealed that Amber's story about extreme bullying was untrue. At trial Daniel admitted he confronted Amber outside the school after the meeting, she did not respond to him as she walked away so he

5

yelled to her. The following Monday Amber obtained an *ex parte* order of protection by claiming that Daniel engaged in abusive threats and touching. She also claimed that Daniel physically and emotionally abused K.B. on unspecified days that same month and commanded him not to tell anyone. Daniel was prohibited from seeing K.B. for approximately one month until an agreed order for supervised visitation was entered. A week after the visitation order, Amber agreed to dismiss the order of protection altogether, and the parties agreed for the child to engage in counseling.

¶ 14 In November 2018, Amber once again sought an *ex parte* order of protection. She alleged that Daniel was not feeding K.B. and was refusing to give K.B. prescribed allergy medication. The court denied the emergency order of protection. Despite the court's decision, Amber refused Daniel his parenting time from November 12, 2018, to January 15, 2019. At trial, Amber initially denied she withheld visits, but when confronted with both the previous testimony of a police officer who witnessed her action and her own text messages plainly stating she was going to keep K.B. from Daniel, she admitted her interference. In court she explained that she did not surrender K.B. when the police were present because "We were fighting…like always." Ultimately, Daniel was unable to resume visitation with K.B. until after Amber retained counsel and litigation escalated.

¶ 15 Amber justified her actions in part by claiming Daniel was starving K.B., causing him to be sick and lose ten pounds in a month, which was "intense". She stated that she had to take food to K.B.'s school on the days K.B. was in Daniel's care to ensure he was eating. Amber also stated that between December 2018 and January 2019, when she kept K.B. from Daniel, K.B. gained ten pounds. Although K.B.'s medical records confirmed that he gained 10.53 pounds

between his August 2018 and his January 2019 appointments, the record also showed that he was overweight, and the doctor counseled both Daniel and Amber on the risks of childhood obesity.

¶ 16        Daniel stated that on his parenting days he prepared K.B. a healthy school lunch, and Weiss testified that the school also offered a free balanced lunch to all of the children. Weiss also testified that Amber would bring K.B. lunch from a fast food restaurant and his other lunch would be thrown in the garbage.

¶ 17        In December 2018, during the time she prevented Daniel from seeing K.B., Amber unilaterally decided to withdraw K.B. from school. She testified that prior to implementing that decision she went to Daniel's home, discussed homeschooling with him in his living room and obtained his consent. Daniel denied this discussion ever took place. Weiss testified that Daniel was surprised when Weiss informed him K.B. was no longer attending the school. Angela Minas, K.B.'s teacher, testified that K.B.'s performance was the same or slightly diminished after homeschooling, but test results showed his reading scores dropped from the 70th percentile to the 29th percentile between the Fall and Spring.

¶ 18        To correct the drop in performance, the school administration recommended K.B. for a nonobligatory summer learning enrichment program known as Spring Forward. Amber did not enroll K.B. in the program, but Daniel did. At trial, Amber's testimony that Daniel never told her about it was rebutted with text messages between the parties. Daniel took K.B. to Spring Forward on his parenting days for several weeks. Amber never took K.B. to Spring Forward on her parenting days. However, Amber decided to attend the family celebration day on the last day of the program. At trial she claimed that she went to have lunch with K.B. Upon arrival, she found him with Daniel engaged in an activity. K.B. ran up to her to say hello. A few moments later, Daniel saw Amber and K.B. with his backpack, standing over by the door and ready to

7

leave. It was between 10:00 and 10:30 A.M. Daniel told Amber he had the whole day available and that he had planned to stay all day at the camp with K.B. He told her that he would drop K.B. off at her house and she was welcome to stay. Amber got angry and started raising her voice and K.B. started crying. Amber got angrier and louder. A counselor distracted Daniel and Amber left, taking K.B. with her. Daniel texted her to explain that he wanted to continue his parenting time until its scheduled end at 3:00 P.M. Daniel testified that he called the police because Amber was irate, belligerent, and refused to cooperate. Daniel did not see K.B. again that day.

¶ 19        Amber stated that it was nearly impossible to co-parent with Daniel. She believed that no matter what she said, Daniel would want the opposite. She admitted that sometimes she does not communicate well with Daniel. She described it as "violently frustrating." She believed that she and Daniel had continuous unresolved issues over K.B.'s bedtime, medications and general cleanliness. Those discussions, she stated, caused her to look like a "screaming lunatic." She explained that her issues with Daniel grew out of him making major decisions without first discussing them with her. Daniel testified that he leans over backwards to co-parent with Amber and coordinate K.B.'s activities with her. Amber stated that Daniel does not remain calm when they communicate, and that he is verbally aggressive.

¶ 20        Amber accused Daniel of being physically and emotionally abusive to K.B. She claimed that he would send K.B. to bed without having dinner. She also expressed concern about Daniel smoking indoors while in the presence of K.B. She found the smoking problematic because K.B. has a history of respiratory problems and uses an inhaler. Daniel's wife, Isabelle described him as very patient and kind with K.B. When K.B. misbehaves, Daniel usually disciplines him by verbally correcting him. Although Daniel occasionally used physical discipline on K.B., Isabelle

8

never saw Daniel hit K.B. She testified that Daniel might send K.B. to his room if he was in trouble, and she saw him send K.B. to bed without dinner only once.

¶ 21    Daniel testified that K.B. does have a rebellious streak against him but that their relationship is typical of a father and son. Daniel modified his schedule to be available for K.B. and not have to work on parenting days. His typical activities included spending a lot of time outside in parks, going on walks, having saber battles in the yard, and helping K.B. ride a two-wheeled bike. The evenings of parenting days are spent doing homework with K.B. or playing video games. He also tried to wean K.B. away from a "junk food centered diet" by including fruits and vegetables to his diet.

¶ 22    After the trial testimony was heard, the trial court issued a written opinion discussing its factual findings. First, the court found that K.B. was bonded to both Daniel and Amber. The court noted that K.B. was often ill and that Amber was more "aggressive" than Daniel in monitoring his health. It stated that it was "not persuaded that Daniel [was] the cause of, or neglect[ed, K.B.'s] poor health." The court also found that K.B. was overweight for his age. It noted that K.B.'s weight is because "Amber's activities with [K.B. were] focused on reading and gaming. Daniel's activities with [him were] more balanced with a greater emphasis on physical activity." The court concluded that Daniel and Amber were unable to co-parent on K.B.'s nutrition and diet. The trial court also concluded that the parties were unable "to co-parent on the issue of education either."

¶ 23    The trial court also found Amber less credible than Daniel regarding the causes of their inability to co-parent K.B. and explained that Amber's willingness to co-parent with Daniel was "too often conditioned upon Daniel's compliance with her demands." It noted that those demands were belligerent and often made with false allegations of abuse against Daniel. The

9

court stated that K.B. would "benefit from the stability and consistency of one household and one parent making significant decisions." It then found that K.B.'s "best interest would be served if Daniel were awarded all parenting time subject to" some allocations to Amber.

¶ 24 On November 25, 2019, the trial court issued its order regarding the allocation of parenting time, significant decision-making responsibilities and child support. The court found that Daniel had "met his burden of establishing a substantial change in circumstances affecting the wellbeing of [K.B.] such that a modification [was] necessary to serve [K.B.'s] best interest." The court ordered that Daniel be allocated sole decision-making responsibilities regarding K.B.'s education, extracurricular activities, religion, and medical care. To give full effect to its order, the court declared that Daniel's address would be used to enroll K.B. in the appropriate school district starting October 18, 2019. The court also ordered that Daniel's child support obligation be "terminated effective October 18, 2019." Finally, the court granted Daniel exclusive claim to the federal tax credit and state tax deduction for K.B. each year.

¶ 25 This appeal now follows.

¶ 26 ANALYSIS

¶ 27 On appeal, Amber argues that the trial court erred in granting Daniel sole decision-making responsibilities and the majority of parenting time. Under the Dissolution of Marriage Act, a trial court may modify an existing parenting plan "if the court finds, by a preponderance of the evidence, that on the basis of acts that have arisen since the entry of existing parenting plan or allocation judgment or were not anticipated there, a substantial change has occurred in the circumstances of the child or of either parent [such] that a modification is necessary to serve the child's best interests." 750 ILCS 5/610.5(c) (West 2019).

10

¶ 28    As an initial matter, both parties advocate for the use of the manifest weight of the evidence standard of review on appeal. However, that standard only applies when the trial court finds that no substantial change in circumstances has occurred. *In re Marriage of Wengielnik*, 2020 IL App (3d) 180533, ¶ 12. Once the court finds a substantial change and grants or denies a modification, we apply an abuse of discretion standard of review. *Id.* "An abuse of discretion occurs where the trial court's ruling is arbitrary, fanciful or unreasonable, or where no reasonable person would take the view adopted by the trial court." *People v. Chambers*, 2011 IL App (3d) 090949, ¶ 10 (citing *People v. Donoho*, 204 Ill.2d 159, 182 (2003)).

¶ 29    Although the parties did not argue whether the trial court erred in finding a substantial change in circumstances, we find that no abuse of discretion occurred in this finding. The July 28, 2015, agreed order was entered in accord with Amber and Daniel's joint agreement to "discuss the major decisions affecting the health, education, religious training and the general welfare of the child prior to any major decision being made." However, both parties testified that their ability to effectively communicate has diminished, and Amber stated that it was nearly impossible to co-parent with Daniel. The trial court found that Amber violated the agreed order by homeschooling K.B. for an extended period of time. During the same period, Amber denied Daniel his allocated parenting time. Finally, before removing K.B. from school, Amber would interfere with Daniel's parenting time by visiting K.B. during lunch time at school and showing up on days allocated to Daniel. We find it reasonable to conclude that said acts constitute a substantial change in the circumstances since the agreed order was issued.

¶ 30    The occurrence of a substantial change in circumstances is one of two factors necessary for modifying a parenting plan. 750 ILCS 5/610.5(c). The second factor is whether the modification was necessary to serve the best interests of the child. *Id.* In determining the child's

11

best interests, the trial court must consider the relevant factors listed in subsection 602.5(c) of the Act. 750 ILCS 5/602.5(c) (West 2019). Amber argues that the relevant factors did not favor modifying the agreed parenting plan. Alternatively, she argues that if the factors favored a modification, they leaned in favor of allocating the majority of parenting time and all major decision-making responsibilities to her. We disagree with her arguments and conclude that the trial court did not abuse its discretion in modifying the parenting plan to allocate sole decision-making responsibilities and the majority of parenting time to Daniel.

¶ 31     First, the trial court found that Amber and Daniel were unable to co-parent K.B. and that a co-parenting plan could no longer provide K.B. a stable environment. In determining the best interest of a child, the trial court must consider "the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child 750 ILCS 5/602.5(c)(11) (West 2019). The trial court found, and the testimony supports its conclusion, that Amber and Daniel are unable to co-parent K.B. First, Despite Daniel's statement that he is willing to communicate with Amber, she stated that communication with him made her look like a "screaming lunatic." She also admitted that it was nearly impossible for her to co-parent with him. We find, as the trial court did, that Amber's belligerent demands of compliance from and false allegations against Daniel exacerbated their inability to co-parent.

¶ 32     Second, K.B.'s educational setting and performance are relevant factors to be considered under the Act. 750 ILCS 5/602.5(c)(11) (West 2019). Despite the agreed order, Amber withdrew K.B. from his school without first discussing the matter with Daniel, leading to a significant decrease in his test scores and school performance. After K.B. was re-enrolled in school, Amber resisted his placement in a summer program intended to correct his declining performance. She went as far as to interrupt Daniel's parenting time because she opposed K.B.'s attendance in the

12

program. On the other hand, Daniel neither interfered with the school administration nor excluded Amber from relevant decision-making.

¶ 33 Finally, the trial court may consider the child's mental and physical health, 750 ILCS 5/602.5(c)(1) as well as any other factor it expressly finds to be relevant. 750 ILCS 5/602.5(c)(15). Here, the trial court expressly found that that the parents were not able to co-parent on decisions related to K.B.'s health and nutrition. Amber and Daniel disagreed on K.B.'s diet with Amber unilaterally altering K.B.'s school diet during Daniel's parenting time. While she was homeschooling K.B. and had exclusive control over his diet, K.B. gained ten pounds and was medically declared overweight. The doctor ultimately discussed the risk of childhood obesity with both parents. On these bases, we find ample evidence in the record to support the trial court's find that there had been a substantial changes in the ability of the parties to cooperatively co-parent and that the best interests of K.B. would be served by changing his residence and the primary decision-making from Amber to Daniel.

¶ 34                                                    CONCLUSION

¶ 35 The judgment of the circuit court of Rock Island County is affirmed.

¶ 36 Affirm.